(C. D. 577)

AYRTON METAL CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided January 5, 1942)

*Daniel P. McDonald* for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Richard E. FitzGibbon,* special attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: This is a suit against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted on a particular importation described in the invoice as "TIN LEAD ALLOY IN SLABS." The merchandise was classified by the collector of customs as solder under paragraph 392 of the Tariff Act of 1930, and duty was assessed on the lead contained therein at the rate of 2⅛ cents per pound in accordance with the provision of said paragraph. It is claimed that said merchandise is properly entitled to free entry under the provision in paragraph 1786 of said act for "alloys in chief value of tin not specially provided for."

At the first hearing, held at New York on May 13, 1940, a motion for the issuance of a commission out of this court was granted to take the testimony of B. F. Ewell, president of the Rochester Lead Works, Incorporated, at Rochester, N. Y., and of J. N. Novasel, president of the Victory White Metal Co. at Cleveland, Ohio, over the objection of counsel for the Government on the ground that such testimony was immaterial. Both of said commissions were returned and filed in this court.

At the second hearing, held at New York on March 10, 1941, a report showing an analysis of a sample of the imported merchandise submitted by H. W. Eckweiler, Government chemist, was admitted in evidence as exhibit 1. This report reads as follows:

> The sample is solder metal containing:
> 46.3% lead
> 0.5% antimony
> Remainder—tin
> Copper and zinc not more than trace.

Upon this report it was stipulated and agreed by and between counsel for the respective parties in open court that the merchandise at bar was in chief value of tin.

In addition to said chemist's report, the plaintiff offered in evidence the testimony of two witnesses. The first, John P. Collins, accountant in the employ of the plaintiff-corporation, testified that he recorded all of the incoming and outgoing invoices of his company and the merchandise covered thereby. The witness' testimony that a portion of the merchandise at bar was sold to the Victor White Metal Co. of Cleveland, Ohio, on objection by counsel for the Government, was stricken from the record on the ground that the books of the company constituted the best evidence rather than the witness' recollection of the same.

The plaintiff's second witness, Burt F. Ewell, president and production and sales manager of the Rochester Lead Works, Incorporated,

testified that his company was engaged in the manufacture of lead products and alloys, including alloys of tin; that he had frequently purchased tin-lead alloys, also tin and lead, and manufactured them into other products; that in or about November, 1939, he purchased several tons of white metal from the Ayrton Metal Co. of New York City, the plaintiff herein; that said metal was purchased upon particular specifications that called for 54.5 per centum tin, .50 per centum antimony maximum, approximately 0.15 per centum impurities, and the balance lead; that when the merchandise was received at his company's plant he personally caused it to be analyzed; that it was found to conform to the prescribed specifications; that the impurities therein consisting of zinc, antimony, and copper rendered the merchandise unsalable until they were removed; that after they were removed and the addition thereto of some virgin lead the merchandise was converted into solder and sold by his company as such; that, based upon his experience of 20 years in the white metal trade, in his opinion the merchandise as received from the plaintiff-corporation was not a commercial grade of solder but was tin alloy; that he was familiar with the specifications published by the Federal Government for solder contained in a pamphlet marked "QQ–S–571" which was admitted in evidence as exhibit 2 over objection by government counsel; that the pamphlet in question is recognized in the white metal trade as authoritative; and that the merchandise at bar does not fall within any of the six classifications or specifications for solder set forth in said exhibit 2.

On cross-examination the witness testified in part as follows:

X Q. Are there any other grades commercially sold besides the grades in these government specifications?—A. May I look at them and see what those grades are again? [The witness examines exhibit 2.]

Judge DALLINGER. Do you understand the question?

The WITNESS. I do. That covers all the commercial grades that are sold.

 By Mr. FITZGIBBON.

 \* \* \* \* \* \* \*

X Q. I direct your attention to page 2 of exhibit 2 to Grade E, where it states "Tin (minimum per cent)—30 per cent". Did the metal you bought have a minimum of 30 per cent tin?—A. It did.

X Q. I direct your attention to the same page where it says, "Antimony (per cent)—.50 to .75". Did the metal you purchased come within that?—A. It did.

X Q. It also states there, "Copper (maximum per cent) .15." Did the merchandise you purchased come within that?—A. It did.

X Q. It also states, "Sum of zinc, aluminum, and cadmium (maximum per cent), .50." Does it state that there?—A. Yes.

X Q. Did the merchandise you purchased come within that?—A. It did.

X Q. Then there is a note (2) before that ".50", and it states under that note, "Not more than 0.30 per cent of zinc, aluminum, or cadmium, individually, will be permitted". Did the merchandise you purchased come within that?—A.

I would not know. It was not analyzed specifically for those impurities; it was for the total impurities.

X Q. But the total impurities did not amount to more than 0.15 per cent?—A. Correct.

X Q. And that gives an allowance of 0.30 per cent. So it did come within that?—A. By inference.

X Q. So that your merchandise came within the government specifications for Grade E solder?—A. It didn't come to those specifications.

\* \* \* \* \* \* \*

X Q. I ask you then d'd your merchandise come within the Grade E specifications for solder as set forth in Exhibit 2?——

\* \* \* · \* \* \* \*

Judge DALLINGER. He is asking you whether this merchandise as you received it from the seller, whether it came within those specifications?——

Judge KINCHELOE. You can answer that question yes or no. If you can't say so.

A. No, it did not.

\* \* \* \* \* \* \*

X Q. Have I asked you about everything in that specifications for Grade E?—A. Yes.

X Q. And you have answered that your merchandise as purchased came within each of those specifications?—A. Came within them, yes.

X Q. Now I call your attention to Grade D which is listed just above Grade E. Did your merchandise as imported come within each of the figures in the columns for Grade D?—A. It came within them.

X Q. It came within them for Grade D?—A. Yes, that is grade D.

On redirect examination the witness testified in part as follows:

R. Q. I invite your attention to Paragraph C of Exhibit 2, denominated in this exhibit as "Material and Workmanship," and ask you to read the matter thereunder.—A. "C-1. Grade A, B, C, and F solder shall be manufactured from new metals. Grade D and E solder may contain reworked metals."

\* \* \* \* \* \* \*

R. Q. \* \* \* Under "E" on page 2 of this government circular which you hold in your hand is specified "Tin (minimum per cent)—30".—A. Yes.

R. Q. How much tin did this merchandise have which you got in your plant?—A. 54.5 per cent. .

R. Q. Would you consider metal containing 54.5 per cent of tin as falling within or complying with the tin specifications for Grade E in this government circular?—A. No.

\* \* \* \* \* \* \*

R. Q. Would having more than 30 per cent tin cause this merchandise to fall outside of Grade E?—A. Yes.

R. Q. Why would it be outside?—A. It doesn't meet the specifications.

R. Q. Wherein does it not meet the specifications?—A. In the tin and lead content.

R. Q. For merchandise actually to fall within Grade D or Grade E, must it contain approximately the amount of lead and tin set forth in this schedule?—A. Yes.

R. Q. And if it contains 54 per cent of tin necessarily the metal would not meet the lead and tin content set forth in this schedule for Grade E?—A. No.

\* \* \* \* \* \* \*

R. Q. I ask you to look over this table on Exhibit 2, to look over the specifications and all the numbers, and to state whether any of the grades therein described closely approximate the metal received in your plant?—A. They do not.

R. Q. Which is the closest one to the metal you purchased?—A. Grade A on lead and tin.

R. Q. That has about 49 per cent tin and 50 per cent lead?—A. Yes. Grade A.

R. Q. Would you say, bearing in mind that the merchandise you imported according to the government analysis had 46 per cent lead, would you say that the imported merchandise falls within or without Grade A?—A. Without.

R. Q. Why without?—A. Because of the impurities.

R. Q. Did the fact it was reworked metal have anything to do with it being without Grade A?—A. Yes, Grade A, B, and C of the Federal Specifications call for virgin metals.

R. Q. What about Grade F?—A. Grade F calls for virgin metals.

R. Q. This metal as received in your plant, was it virgin metal or reworked metal?—A. Reworked metal.

On recross examination the witness testified in part as follows:

R. X Q. Isn't it a fact that the more tin you have makes a better solder?—A. No.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

R. X Q. It makes a more expensive solder, doesn't it?—A. Yes.

R. X Q. You can use it to solder some things that you couldn't use to solder with a lesser per cent of tin?—A. Yes.

R. X Q. A higher percent of lead makes a cheaper solder?—A. It does.

On re-redirect examination the witness testified in part as follows:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

R. D. Q. If metal is bought on specifications for a minimum tin content of 30 per cent, and 54 per cent tin content is delivered, metal containing 54 per cent content of tin, would you say that was a good delivery?—A. It would not be a good delivery.

At the close of the witness' testimony, the deposition of J. N. Novasel, president of the Victory White Metal Co. of Cleveland, Ohio, was admitted in evidence as exhibit 3, over objection by counsel for the Government. From this deposition it appears that said J. N. Novasel, during the month of November, 1939, purchased several tons of a white metal from the plaintiff herein in accordance with the following specifications:

| | Percent |
|---|---|
| Tin | 54. 50 |
| Lead | 44. 85 |
| Antimony (maximum) | . 50 |
| All other impurities | . 15 |
| | 100. 00 |

that he further processed the said metal into another product, but that before doing so it was found necessary to remove certain oxidized impurities; that this was done by bringing the metal to a molten state at about 600° F. whereupon the impurities rose to the surface and were

removed; that before converting the resultant metal into a finished product it was necessary to add virgin lead; that from the witness' 32 years' experience in the white metal trade it was his opinion that the metal as received from the Ayrton Metal Co., Inc., the plaintiff herein, was not the commercial grade of solder but was a tin alloy.

At the third hearing, held at New York on April 14, 1941, the Government offered in evidence the testimony of two witnesses. The first, George H. Bangs, sales manager of the Nassau Smelting & Refining Co., testified that his company was engaged in the business of refining metals from secondary waste and the production of usable alloys; that among the products produced by his company was solder which he had personally sold throughout that portion of the United States east of the Mississippi River; that he was familiar with the specifications for solder set forth on page 607 of the book entitled "American Society for Testing Materials Standards," and that in his opinion exhibit 1 was solder.

On cross-examination the witness testified in part as follows:

X Q. Are you familiar with reclaimed metals?—A. Yes.

X Q. Isn't it a fact in refining those reclaimed metals so as to make solder out of it there are certain impurities that have to be removed?—A. Yes, sir.

 \* \* \* \* \* \* \*

X Q. Are you familiar with the specifications gotten out by the Bureau of Standards for solder?—A. I think I am. \* \* \*.

 \* \* \* \* \* \* \*

X Q. I show you Exhibit 2, and ask you to look it over, and ask you to state whether you are familiar with that?—A. No, I have never seen this before. \* \* \*

 \* \* \* \* \* \* \*

X Q. In your direct examination, I believe you testified, Mr. Bangs, that the merchandise before the court fell into certain specifications gotten out by the A. S. T. M., that is the American Society for Testing Materials.—A. I don't believe I so testified. I said I was familiar with the specifications, but that there are many other grades of solder besides those covered by that.

X Q. Now, I show you this table on page 607 to which you previously alluded and ask you to state within which one of these this metal falls?—A. It is none of these classifications there.

X Q. Do you know of any classification, or is there any standard authority within which this metal falls?—A. No.

 \* \* \* \* \* \* \*

X Q. Would you say that a metal containing approximately 46 per cent of lead, ½ per cent of antimony, and about 53 per cent of tin would be a tin alloy?—A. It is an alloy containing tin which any solder is.

 \* \* \* \* \* \* \*

X Q. \* \* \* You know the present market value of tin?—A. I certainly do.

X Q. What is that, about?—A. 51 cents a pound.

X Q. And the market value of lead is about what?—A. 5.85 cents a pound.

X Q. So if you know a mixture or a combination containing 46 per cent lead and 53 per cent tin, would you say that is in chief value of tin?—A. Certainly; in chief value of tin.

X Q. About ten to one?—A. Yes, in chief value of tin, about ten to one.

X Q. Can you give the court any clear distinction as to what, in your opinion, constitutes a tin alloy and what constitutes solder?—A. I don't think I can.

\* \* \* \* \* \* \*

X Q. If your company received a metal such as this which is described in the chemist's report, would it market it in that condition?—A. We could market it in that condition.

\* \* \* \* \* \* \*

X Q. Do you recall having marketed any such metal within the past few years?—A. Yes.

X Q. With these impurities in it?—A. To the best of my knowledge, yes.

On redirect examination the witness testified in part as follows:

R. Q. It has been testified that some of the imported merchandise was purchased upon the following specifications, and that it came within these specifications; tin, 54.5 percent; antimony, one-half of 1 per cent; other impurities, .15 of one per cent; lead, 44.85 per cent. Would you say that metal such as was made up of those specifications was solder?—A. Yes.

The Government's second witness, Julius H. Sabo, assistant manager of the metals division of the National Lead Co., testified that his company manufactured many types of solder at its plant at Perth Amboy, N. J.; that merchandise containing 46.3 per centum lead, one-half of 1 per centum of antimony, and the remainder tin, except for traces of copper and zinc, is solder.

The witness then testified in part as follows:

Q. If you had that merchandise in pigs, what would you do with it?—A. I would introduce it into a copper kettle and depending on the specifications of the customer I would dilute it either up or down, and it would be cast according to the specifications of the customer.

Q. As solder?—A. As solder.

Q. And sold as solder?—A. And sold as solder.

Q. You would merely cast it in whatever form they wanted the solder in?—A. Correct.

Q. Without doing anything with it?—A. That's right.

On cross-examination the witness testified in part as follows:

X Q. If that is true, Mr. Sabo, why did your company when it received some of this very metal proceed to refine it?—A. From whom did we receive it?

X Q. Received it from the plaintiff in this case, the Ayrton Metal Company, Incorporated.—A. Did we refine it?

X Q. I show you an affidavit executed by C. W. Gesregan, dated December 27, 1939, and ask you if you recognize Mr. Gesregan's signature to that affidavit?—A. Yes, that is his signature.

X Q. Is he an official of your company?—A. He is manager.

X Q. I invite your attention to the first page of Mr. Gesregan's affidavit.—A. What was the composition of this solder. May I have that?

X Q. It was this identical solder.—A. I would like to see the analysis before I comment on it. * * *

X Q. Do you know anything about purchases made by your company?—A. I do know we purchased some material from The Ayrton Metal Company.

X Q. During the month of November, 1939?—A. That is probably around the time, yes.

X Q. By reading Mr. Gesregan's affidavit, do you wish to change your testimony?—A. No, sir.

At the fourth hearing, held at New York on June 9, 1941, the plaintiff offered in evidence the testimony of a third witness, George B. Oliphant, who testified that he was employed by the plaintiff-corporation in November, 1939, to sell the merchandise herein; that he sold some of it to the Rochester Lead Works of Rochester, N. Y.; that he also sold some to the Victory White Metal Co. of Cleveland, Ohio; and that he also sold some to the National Lead Co. of New York City.

On cross-examination the witness testified in part as follows:

X Q. How much metal was imported in this particular importation?—A. I believe there was around 50 tons.

* * * * * * *

X Q. How was this metal imported; do you know? In what kind of bars?—A. It was imported in pigs weighing about a hundred pounds each.

* * * * * * *

X Q. As a matter of fact, you don't know of your own knowledge whether the metal that was delivered to the Rochester Lead Works or the Victory White Metal Company, or the National Lead Company came from this particular shipment?—A. Oh, yes.

X Q. How do you know?—A. Because we issued the delivery orders at the pier from the "American Banker".

* * * * * * *

X Q. Do you know what ship it came off?—A. The "American Banker".

X Q. On what date?—A. I think I can tell you from the contract that I have here. The contract reads that the ship is the "American Banker", scheduled to dock at New York on November 4th, discharge anticipated but not guaranteed, November 7th. This is 1939 I am quoting on. * * *

* * * * * * *

X Q. How much did you sell to the Rochester Lead Works?—A. I sold them 5 tons.

X Q. How much did you sell to the Victory White Metal Company?—A. Five tons.

X Q. How much did you sell to the National Lead Company?—A. Ten tons.

* * * * * * *

X Q. You have sold other metal for this importer?—A. Yes.

X Q. And you always delivered the delivery slips from the steamship or the dock?—A. Yes; * * *.

At the conclusion of this witness' testimony counsel for the Government moved to strike out the same, which motion was denied.

Upon this record counsel for the Government in his brief filed herein lays great stress upon the cross-examination of the plaintiff's witness Ewell wherein he admitted that the merchandise at bar conformed to the requirements of grades D and E for solder, as set forth in the Government pamphlet admitted in evidence as exhibit 2, over the strenuous objection of counsel for the Government. It is to be noted, however, that while said specifications called for a certain minimum of tin, there is nothing stated as to the percentage of lead, nor is there anything stated with regard to the existence of impurities.

Moreover, the testimony of both of the plaintiff's witnesses was to the effect that the merchandise described on the invoice by the apraiser (and which description was adopted by the collector) as "solder metal" contained certain impurities which had to be removed and virgin lead added before the resultant product could be commercially sold as solder.

In volume III, page 2239, of Knight's American Mechanical Dictionary occurs the following:

Solders are distinguished by specific names, defining quality, composition, or purpose, as *hard, soft, white, spelter, gold, silver, copper, tin, plumber's, pewterer's, button,* etc.

*Hard* solders are such as require a red heat to fuse them; they are employed for joining brass, iron, and the more refractory metals. Soft solders melt at a comparatively low temperature, and are used with tin and lead, of which metals they are wholly or in part composed. Common tin solder, composed of 1 tin and 2 lead, is perhaps the best-known example of this class. * * *

Solders.

*Soft.* For lead: tin, 1; lead, 1½. For tin: tin, 1; lead, 2. For pewter: tin, 2; lead, 1.

*Hard.* For brazing, hardest: copper, 3; zinc, 1. For brazing, hard: tin, 1; copper, 4; zinc, 3. For brazing softer: tin, 2; antimony, 1.

Apparently, then, according to this authoritative source, there exists in trade and commerce various solders which contain a comparatively small amount of lead. Query: Did Congress intend to include such solders within the purview of said paragraph 392? We do not think so, particularly since that paragraph has been declared to be essentially a lead paragraph. *Marks Lissberger & Son, Inc.* v. *United States*, T. D. 49634, 73 Treas. Dec. 1035; *United States* v. *Nassau Smelting & Refining Works, Ltd.*, 17 C. C. P. A. 382, T. D. 43821.

In excluding from the provisions of paragraph 393 of the Tariff Act of 1922, of which the present paragraph 392 is a literal reenactment, certain metal containing lead but in chief value of copper, the appellate court said:

An examination of paragraph 393 shows it to be a lead paragraph, and we must hold that it was not intended by the provision "all alloys or combinations of lead,

not specially provided for" to include such metal as is before us. It may be an alloy in one sense and it may be a combination, but we do not regard it as an alloy of lead or a combination of lead within the meaning of paragraph of 393. It is more an alloy of copper or a combination of copper than a lead article. * * *

Paragraph 1555 is quite specific as applied to this material. "Composition metal of which copper is the component material of chief value" would seem to fit this material exactly and we think it classifiable thereunder.

In the instant case we have certain slabs of metal admittedly composed in chief value of tin, the tin being ten times more valuable than the lead content and likewise exceeding the lead in quantity. Incidentally, it is significant that the principal witness for the Government not only admitted that the instant merchandise did not comply with any of the specifications set forth in the book entitled "American Society for Testing Materials Standards," but also conceded that there was a clear distinction between the terms "solder" and "solder metal."

Upon the entire record we find as a fact that the merchandise at bar described in the invoice as "solder metal" and apparently classified by the collector under the *eo nomine* provision in paragraph 392 of the Tariff Act of 1930 for "solder," at the time of its importation contained certain impurities which had to be removed and virgin lead added before it could be commercially sold as solder. We therefore hold as a matter of law that said imported merchandise is not solder within the meaning of said paragraph 392, but merely a material out of which solder is made; and that it is properly entitled to free entry under the provision in paragraph 1786 of said act for alloys in chief value of tin not specially provided for, as alleged by the plaintiff. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.